(May 23, 1911.)

GEORGE W. FLETCHER, Plaintiff, v. WILFRED L. GIFFORD, as Secretary of State, Defendant.

[115 Pac. 824.]

CONSTITUTIONAL AMENDMENT—CONSTRUCTION AND INTERPRETATION—LEGISLATIVE INTENT—INTENT OF PEOPLE IN VOTING ON AMENDMENT—OMISSION OF WORD.

(Syllabus by the court.)

1. Where the legislature, in proposing an amendment to sec. 1 of art. 8 of the state constitution, stated in the title to the resolution submitting such amendment that the amendment was intended "to permit the legislature to authorize a bond issue sufficient to com-

plete the construction and furnishing of the State Capitol Building at Boise," and the section providing the manner and form of submitting the question directed that it should be in the following language, "Shall sec. 1 of art. 8 of the constitution of the state of Idaho be amended so as to permit the legislature to authorize a sufficient bond issue or make a sufficient appropriation to complete the construction and furnishing of the State Capitol Building at Boise, Idaho?" *Held,* that it was both the intention of the legislature in making the submission and of the people in voting to adopt the proposed amendment, to amend the original section of the constitution only in so far as to grant the power to the legislature to authorize a bond issue sufficient to "complete the construction and furnishing of the State Capitol Building" then in process of construction. *Held,* further, that the omission of the word "not" after the word "shall" in the first line of the section was an oversight, mistake or inadvertence, and that it was clearly the intention of the legislature in proposing the amendment and of the people in voting to adopt it that it should be read with the word "not" contained therein and as follows: "The legislature shall not in any manner create any debt or debts," etc.

2.   It was clearly not the purpose of the legislature in submitting the proposed amendment to sec. 1, art. 8, of the state constitution to remove the debt limitation from the constitution, nor was it the intention or purpose of the people in voting to adopt the amendment to remove the debt limitation from the constitution and authorize the legislature to incur an unlimited indebtedness against the state.

3.   Where a section of the constitution is apparently contradictory in its parts or a literal reading and construction thereof would render it contradictory and absurd, it should be so construed in the light of the purposes and objects to be accomplished and the manifest intent of the law-making body in submitting the same, and the people in voting to adopt it, as to render its several provisions harmonious, and to give the whole section a practical effect and accomplish the purpose and objects intended.

Original action praying for a writ of mandate.   Demurrer to the answer sustained and peremptory writ issued.

E. G. Davis, for Plaintiff.

"In the exposition of a statute the intention of the lawmakers will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be col-

lected from the occasion and necessity of the law, from the mischief felt and the remedy in view; and the intent is to be taken or presumed according to what is consistent with reason and good discretion.'' (Lewis' Sutherland on Stat. Const., art. 370; *Jennings v. Love,* 24 Miss. 249; *People v. Utica Ins. Co.,* 15 Johns. (N. Y.) 358, 8 Am. Dec. 243; *Swann v. Buck,* 40 Miss. 268; *Taylor v. Palmer,* 31 Cal. 240.) ''The different sections or provisions of the same statute should be so construed as to harmonize and give effect to each, but, if there is an irreconcilable conflict, the later in position prevails.'' (*Ex parte Thomas,* 113 Ala. 1, 21 So. 369; *Hand v. Stapleton,* 135 Ala. 156, 33 So. 689; *Van Horn v. State,* 46 Neb. 62, 64 N. W. 365.)

''The intention of the legislature being ascertained with reasonable certainty, words may be supplied in the statute so as to give it effect and avoid any repugnance or inconsistency with such intention.'' (*Orvil v. Woodcliff,* 64 N. J. L. 286–291, 45 Atl. 686; *State v. Moore,* 37 Neb. 13, 55 N. W. 299; *Hutchings v. Commercial Bank,* 91 Va. 68, 20 S. E. 950; *Haney v. State,* 34 Ark. 263.)

D. C. McDougall, Attorney General, and J. H. Peterson, Assistant, for the Defendant, file no brief.

AILSHIE, Presiding J.—This is an application for a writ of mandate to compel the defendant, as secretary of state of the state of Idaho, to affix his signature to bonds of the state of Idaho, authorized by acts of the legislature of the eleventh session, aggregating the sum of $1,161,500. The bonds so authorized are for the purposes hereinafter stated, and run for periods of time, bear the rate of interest, and are in the amounts as follows:

Opinion of the Court—Ailshie, Presiding J.

| | Time. | Rate. | Amount. |
|---|---|---|---|
| Lincoln-Twin Falls Bridge. | 6 years | 5% | $ 5,000.00 |
| Paris Franklin Road | 20 " | 4% | 2,500.00 |
| Kootenai Wagon Road | 20 " | 5% | 25,000.00 |
| Leadore-Pahsimeroi Road | 20 " | 5% | 5,000.00 |
| Salmon-Challis Road | 20 " | 4½% | 7,500.00 |
| Mountainhome Bridge | 20 " | 4% | 15,000.00 |
| Canyon-Snake River Bridge | 20 " | 5% | 25,000.00 |
| North and South Wagon Road | 20 " | 4% | 20,000.00 |
| Deaf and Blind School | 20 " | 4% | 30,000.00 |
| St. Maries Bridge | 20 " | 4% | 9,000.00 |
| North Idaho Insane Asylum | 20 " | 4% | 35,000.00 |
| Capitol Building | 20 " | 4½% | 750,000.00 |
| Idaho Sanitarium | 20 " | 4% | 25,000.00 |
| South Fork Bridge | 20 " | 4% | 5,500.00 |
| Ross Fork Road | 20 " | 4% | 20,000.00 |
| University of Idaho | 20 " | 4% | 75,000.00 |
| Burley Bridge | 20 " | 5% | 10,000.00 |
| Whitebird-Dumacque Road | 20 " | 4½% | 4,000.00 |
| Twin Falls Lincoln County Bridge | 20 " | 4% | 6,000.00 |
| Idaho Oregon Bridge | 10 " | 5% | 10,000.00 |
| Soldiers Home | 20 " | 4% | 13,000.00 |
| State Penitentiary | 20 " | 4% | 30,000.00 |
| Industrial Training School | 20 " | 4% | 33,000.00 |

It is alleged that the bills authorizing and directing the bond issues for the foregoing purposes and amounts were duly and regularly passed by the legislature and approved by the governor, and that they are in conformity with and are authorized by sec. 1 of art. 8 of the state constitution as the same was amended and adopted by a vote of the people at the November election, 1910. It is alleged by the petition that the defendant refuses to affix his signature to the bonds hereinbefore enumerated, for the reason assigned by him that the amendment to sec. 1 of art. 8 of the constitution as adopted at the November election, 1910, is so vague, indefinite, ambiguous and unintelligible that it renders the same void, and that the amendment, therefore, never affected or altered the original provisions as embodied in sec. 1 of art. 8 of the constitution, and that the bond issue thus authorized would exceed the debt limitation of the constitution as originally embodied in sec. 1 of art. 8.

The defendant has filed an answer in which he admits that he has refused to attach his signature to the bond issues authorized by the several acts above enumerated, and that he has refused to do so for the reason set out in the petition.

The plaintiff has demurred to the answer on the ground that it does not state facts sufficient to constitute a defense to the cause of action pleaded. It is admitted that if the amendment to sec. 1, art. 8, of the constitution, as adopted by the people at the November election, 1910, is intelligible, valid and operative, that the bond issue acts of the eleventh session of the legislature are also valid and binding, and that it is the duty of the secretary to attach his signature to the bonds above enumerated in conformity with the several acts authorizing the bond issues.

The whole difficulty in this case arises over what is alleged by the plaintiff to be a mere omission of the word "not" from the first line of section 1 embodied in house joint resolution No. 3 as the same was finally enrolled, signed and filed with the secretary of state.

Sec. 1 of art. 8 of the state constitution, which it was proposed to amend, reads as follows:

"The Legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, exclusive of the debt of the Territory at the date of its admission as a state, exceed the sum of one and one-half per centum upon the assessed value of the taxable property in the state, except in case of war to repel an invasion or suppress insurrection, unless the same shall be authorized by law for some single object of work to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability, as it falls due; and also for the payment and discharge of the principal of such debt or liability, within twenty (20) years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged; but no such law shall take effect until at a general election it shall have been submitted to the people, and shall have received

a majority of all the votes cast for and against it at such election; and all moneys raised by the authority of such law, shall be applied only to the specified object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, or city and county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people. The legislature may at any time after the approval of such law, by the people, if no debts shall have been contracted in the pursuance thereof, repeal the same.''

At the tenth legislative session a resolution was introduced proposing an amendment to the foregoing section, and the resolution was duly and regularly adopted by both houses of the legislature, and was finally enrolled and certified by the presiding officers and filed with the secretary of state. The avowed purpose of the resolution, as indicated by the title to the same (Sess. Laws 1909, p. 447), was ''to permit the legislature to authorize a bond issue sufficient to complete the construction and furnishing of the State Capitol Building at Boise.''

Section 2 of the resolution provided the manner and form of submitting the question to the people, and required that it be submitted in the following words:

''Shall Section one of article eight of the Constitution of the State of Idaho be amended so as to permit the Legislature to authorize a sufficient bond issue or make a sufficient appropriation to complete the construction and furnishing of the State Capitol Building at Boise, Idaho?''

The amendment itself, however, to sec. 1, art. 8, as embodied in the resolution and finally enrolled and filed with the secretary of state, reads as follows:

''Section 1. The Legislature shall in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, exclusive of the debt of the Territory at the date of its admission as a State, and exclusive of debts or liabilities incurred subsequent to January 1, 1911, for the purpose of completing the construction and furnishing of the

State Capitol Building at Boise, Idaho, exceed the sum of one and one-half per centum upon the assessed value of the taxable property in the State, except in case of war to repel an invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for payment of the interest of such debt or liability as it falls due and also for the payment and discharge of the principal of such debt or liability, within twenty (20) years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged; but no such law shall take effect until at a general election it shall have been submitted to the people, and shall have received a majority of all the votes cast for and against it at such election; and all moneys raised by the authority of such laws, shall be applied only to specified objects therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county or city and county, if one be published therein, throughout the State for three months next preceding the election at which it is submitted to the people. The Legislature may at any time after the approval of such law, by the people, if no debts shall have been contracted in the pursuance thereof, repeal the same.''

It will be noted that the amendment embodies the identical language of the original section, with the exception that the word ''not'' is omitted after the word ''shall'' in the first line of the section, and that the following additional words are inserted in the first part of the sentence and immediately after the clause which excludes the debt of the territory at the date of the admission of the state: ''And exclusive of debts or liabilities incurred subsequent to January 1, 1911, for the purpose of completing the construction and furnishing of the State Capitol Building at Boise, Idaho.'' Now, it is apparent from the title to the resolution and also from section 2 thereof, which provided the manner and form of the submission to the people, that the only purpose of the amend-

ment was to exclude from the debt limitation of this section of the constitution such debts or liabilities as might necessarily be incurred subsequent to the first day of January, 1911, "for the purpose of completing the construction and furnishing of the State Capitol Building." If, however, we should read this section as amended with the "not" omitted from the first line, we would see at once that the amendment removes all debt limitation absolutely. And not only that; it would be in the form of a command to the legislature to incur debts or liabilities which would exceed the sum of one and one-half per centum upon the assessed valuation of the taxable property of the state. This would render the new and additional language which was inserted in the amendment, namely, "and exclusive of debts or liabilities incurred subsequent to January 1, 1911, for the purpose of completing the construction and furnishing of the State Capitol Building at Boise, Idaho," meaningless and absurd. Had it been the purpose of the legislature to remove the debt limitation absolutely, then there would have been no object in excluding any class or kind of debts or liabilities from the aggregate indebtedness which may be incurred and which goes to make up the debt limitation as the section reads in the constitution as originally adopted. Neither the title to the resolution nor the question submitted to the people indicated any purpose of removing the debt limitation from the constitution. It is perfectly clear that the word "not," as it appeared in the section before the amendment, was omitted from the amendment by error, oversight or inadvertence in course of printing, engrossing or enrolling the bill; and it appears equally clear and satisfactory to us that the legislature submitted the amendment on the theory that it still retained the debt limitation, and that the word "not" was contained in the amendment, and that the amendment as adopted should be read and construed in that light. No proposition was submitted to the people to remove the debt limitation from the constitution, and they had no opportunity of voting on that question except by rejecting the entire amendment. The attorney general, who appears as counsel for the secretary in

this case, admits that the resolution when it was originally introduced did in all probability contain the word "not," and that somewhere or other the word has been dropped out by error or mistake without the knowledge of the law-making body and without their attention being called to the same. He also admits that it was clearly the intention to retain the word "not" in the amendment. If we undertake to read the section literally as it stands amended with this word omitted, it renders the section contradictory in its parts and meaningless as a whole. If, however, we read it with the word "not" inserted, as was the evident intention of both the legislature in submitting it and the people in voting on it, the section is intelligible and the exception, for which the amendment was inserted in the resolution and for which the amendment was adopted, becomes at once apparent and obvious, and specific and definite in its purpose and object.

We are not unmindful of the general rule applicable in construing amended statutes, namely, that where words have been omitted from the amendment that were contained in the section intended to be amended, the law-making body will be presumed to have deliberately and intentionally omitted such words. This rule, however, must be applied in the light of other well-recognized rules, one of which is that where a statute is apparently contradictory in its parts, or a literal reading would render it contradictory, it must be so construed in the light of the purposes and objects to be accomplished and the manifest intent of the law-making body as to reconcile the several provisions and give the whole a practical and sensible effect. Here the title to the resolution, the section providing for the submission, the additional language actually inserted in the section by way of amendment, and the context and attending indications, all lead to the inevitable conclusion that the amendment was treated and considered and understood by both the legislature in submitting it and the people in adopting, as if the word "not" was contained in the first line immediately following the word "shall," and to so read it gives effect to all its parts and renders it harmonious and intelligible. To read it literally

with the word "not" omitted renders the additional language and subject matter inserted in the section by way of amendment unintelligible and meaningless, and at the same time furnishes no reason or excuse for the omission of the word, and leads to a contradiction of the thought and idea that is conveyed if the word is omitted. In other words, the idea conveyed by the omission of the word "not" and that conveyed by the insertion of the new matter by way of exception are directly condictory to each other, and are inharmonious and inconsistent ideas and provisions. Again, it would require clear, definite and unmistakable language in an amendment to a constitutional provision of this kind to satisfy a court· that a legislative body, by a two-thirds vote in each branch thereof, actually intended to remove the debt limitation from the constitution and subject the state to an unlimited debt liability for any and every purpose for which any legislature might, by a majority vote in ·each branch thereof, see fit to vote bonds or obligate the state. It is still more difficult to believe that the people in voting to adopt the amendment ever thought for a moment that they were voting for an amendment that would absolutely remove the debt limitation from the state constitution. The people, when they voted to adopt this amendment, evidently thought the only change that they were making in the state constitution was that of authorizing the legislature to issue bonds sufficient in amount to complete and furnish the State Capitol Building then under process of construction— beyond this they had no thought of going. That is the only proposition that was submitted to them by section 2 of the resolution as above set out.

We are not wholly without precedent on this question. In *Hutchings v. Commercial Bank,* 91 Va. 68, 20 S. E. 950, the court was confronted with an act of the legislature in relation to "equitable separate estates." The act, among other things, contained a provision that separate estates therein enumerated should be held according "to the provisions and limitations of this act so far as they are in conflict therewith." It was contended that the word "not" had been omitted and that

it was intended to make the act read "so far as they are not in conflict therewith." The court held that the statute must be read as though the word "not" had been inserted, for the reason that it was evident from the face of the act and the purpose that was intended to be accomplished that the word had been omitted by mistake or inadvertence, and that to read the act literally would lead to an absurdity. The court, among other things, said: "The omission of the word 'not' at the point indicated makes the whole act incongruous and unintelligible, while, with that word incorporated, it is easily understood, clear, and makes the whole act harmonious. It is apparent that 'the omission was an inadvertence. To adopt a literal construction of the act, as it stands, would lead to absurd results; and we cannot suppose the legislature to have intended such results. We appreciate the danger, and consequently the great caution to be exercised by courts, in construing statutes, not to add to or take from them one jot or tittle, except in cases where the duty is plain, in order to give an intelligent effect to the statute, and thereby carry out the manifest intent of the legislature."

In *Haney v. State,* 34 Ark. 263, the court had under consideration the question of the power and authority of the court to substitute one word for another in a legislative act in order to make the act express what was evidently meant by the legislature, and thereby give the act force and effect. In discussing the power and the duty of the court in such a case, it was said:

"It is very true, as a general rule of construction, that where the language of an act is plain and unambiguous, the courts must give it effect, as it stands, or declare the law unconstitutional. But this rule is subject to much qualification, and does not apply to cases of plain clerical errors, where it is obvious that the legislature *did not intend* to use the word as written, and it is further apparent what word they *did* intend. A mistake of this nature may be corrected by the courts, upon as sound principle as a mistake in a deed. It is not judicial legislation, nor judicial interference with the legislative will. It is in support of the

legislative will, and wholly distinct from the reprehensible practice of warping legislation to suit the views of the courts as to correct policy. The only conditions to be observed in the exercise of this power of literal correction are, that the courts should be thoroughly and honestly satisfied of the legislative intent, irrespective of the policy of the act."

From what has been said we conclude that the amendment is valid and operative, and that it was the intention of the legislature in submitting it and of the people in voting to adopt it that it should retain the debt limitation and should read: "The legislature shall not in any manner create any debt," etc., and that authority should be conferred on the legislature to issue bonds sufficient to complete and furnish the State Capitol Building. The demurrer is sustained and a peremptory writ will issue. No costs awarded.

Sullivan, J., concurs.